# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
<u>Rajiv V. Thairani (State Bar No. 344390)</u>
<u>rajiv@gutridesafier.com</u>
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

VISHAL SHAH, HEIDI WILLIS, and STACY PENNING, individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

POLITICO LLC,

Defendant.

CASE NO. 5:25-cv-05213-NW

**~~FIRST~~<u>SECOND</u> AMENDED CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); ~~USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51);~~ COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT**

JURY TRIAL DEMANDED

## TABLE OF CONTENTS

~~INTRODUCTION ........ 1~~
~~THE PARTIES ........ 3~~
~~JURISDICTION AND VENUE ........ 3~~
~~SUBSTANTIVE ALLEGATIONS ........ 5~~
~~A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies. ........ 5~~
~~B. Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. ........ 10~~
~~C. The Private Communications Intercepted and Collected Through Third Party Cookies Defendant's Website. ........ 26~~
~~1. The Website Causes the Interception of the Contents of Communications. ........ 26~~
~~2. Google Cookies. ........ 26~~
~~3. Adobe Cookies. ........ 31~~
~~4. LiveRamp Cookies. ........ 33~~
~~5. Additional Third Party Cookies. ........ 34~~
~~D. The Third Parties Intercept User Communications While in Transit. ........ 40~~
~~E. The Private Communications Collected are Valuable. ........ 42~~
~~PLAINTIFFS' EXPERIENCES ........ 44~~
~~CLASS ALLEGATIONS ........ 52~~
~~CAUSES OF ACTION ........ 54~~
~~First Cause of Action: Invasion of Privacy ........ 54~~
~~Second Cause of Action: Intrusion Upon Seclusion ........ 57~~
~~Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........ 59~~
~~Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ........ 63~~
~~Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ........ 65~~
~~Sixth Cause of Action: Unjust Enrichment ........ 68~~
~~PRAYER FOR RELIEF ........ 69~~
INTRODUCTION ........ 1
THE PARTIES ........ 3
JURISDICTION AND VENUE ........ 3
SUBSTANTIVE ALLEGATIONS ........ 6
A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies. ........ 6
B. Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. ........ 12

C. The Private Communications Intercepted and Collected Through Third Party Cookies On Defendant's Website. 27
1. The Website Causes the Interception of the Contents of Communications. 27
2. Google Cookies. 28
3. Adobe Cookies. 32
4. LiveRamp Cookies. 34
5. Additional Third Party Cookies. 36
D. The Third Parties Intercept User Communications While in Transit. 42
E. The Private Communications Collected are Valuable. 44
PLAINTIFFS' EXPERIENCES 45
CLASS ALLEGATIONS 54
CAUSES OF ACTION 56
First Cause of Action: Invasion of Privacy 56
Second Cause of Action: Intrusion Upon Seclusion 59
Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) 61
Fourth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation 67
Fifth Cause of Action: Unjust Enrichment 70
PRAYER FOR RELIEF 71

Plaintiffs Vishal Shah, Heidi Willis, and Stacy Penning ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Politico LLC ("Defendant" or "Politico"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns an egregious violation of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.politico.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can opt out of the collection and sale of their personal information by clicking on Defendant's "Do Not Sell My Information" link and rejecting cookies in the cookie preference center by toggling off "Performance Cookies" and "Online Behavioural Advertising" cookies, as shown in the following screenshots:









2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third party data brokers and advertisers. The representations were false.

3. Even after users elect to toggle off "Performance Cookies" and "Online Behavioural Advertising" cookies, Defendant nonetheless caused multiple third parties—including Google LLC (DoubleClick and Google Analytics), Adobe Inc. (demdex.net), LiveRamp Holdings, Inc. (rlcdn.com), Microsoft Corp. (AppNexus, adnx.com and LinkedIn), The Trade Desk, Inc. (adsrvr.org), Comscore, Inc. (Scorecard Research), PubMatic, Inc., Amazon.com, Inc., X Corp (Twitter), Yahoo, Inc., Criteo S.A., Sonobi, Inc., GumGum, Inc., OpenX Technologies, Inc., and others (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4. Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including~~,~~ creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts,

etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid by clicking the "Do Not Sell My Information" link on the cookie consent banner and toggling off "Performance Cookies" and "Online Behavioural Advertising" cookies in the "Manage Consent Preferences" window. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices, and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Vishal Shah is, and was at all relevant times, an individual and resident of San Jose, California. Plaintiff Shah intends to remain in California and makes his permanent home there.

8. Plaintiff Heidi Willis is, and was at all relevant times, an individual and resident of Lakewood, California. Plaintiff Willis intends to remain in California and makes her permanent home there.

9. Plaintiff Stacy Penning is, and was at all relevant times, an individual and resident of El Cerrito, California. Plaintiff intends to remain in California and makes his permanent home there.

10. Defendant Politico LLC is a Delaware corporation with its headquarters and principal place of business in Arlington, Virginia. According to Defendant's filings with the California Secretary of State, Politico LLC's managing member is Politico Media Group, LLC, located in Arlington, Virginia.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

12. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, ~~and~~in continuous business practices in the State of California. For example, one of the four state jurisdictions that Defendant reports on is California. Indeed, it has a team of reporters in California to cover the state and therefore benefit from the market of California users.

13. Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

15. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## DELAYED DISCOVERY AND TOLLING ~~AND RELATED ARBITRATON PROCEEDINGS~~

16. The delayed discovery rule applies to Plaintiff Willis and Plaintiff Penning's claims. Plaintiff Willis and Plaintiff Penning were unaware that even though they rejected all non-strictly necessary cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data until ~~on or around January~~February 2026 when they learned of Defendant's privacy violations from ~~their~~ counsel. As alleged above, Plaintiff Willis and Plaintiff Penning do not have the expertise to test whether the Website honored users' requests to opt out of cookies and tracking technologies.

~~17. Despite exercising reasonable diligence, Plaintiff Willis and Plaintiff Penning were unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiff Willis and Plaintiff Penning from discovering their claims within the statute of limitations. Further, Plaintiff Willis and Plaintiff~~

Penning's claims were equitably tolled by Plaintiff Shah's demand letter and Plaintiff Shah's filing of the arbitration proceeding because Defendant had notice of the claims (and Plaintiff Shah's intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiff Willis and Plaintiff Penning's claims since their claims asserted in this Complaint are substantially similar to those in the demand letter and arbitration proceeding. These extraordinary circumstances, including Defendant's intentional misrepresentations, warrant tolling of the statute of limitations to allow Plaintiff Willis and Plaintiff Penning to pursue their claims in this forum. Plaintiff Willis and Plaintiff Penning acted in good faith and engaged in reasonable conduct in filing this Complaint in this action.

17. When visiting the Website, Plaintiff Willis and Plaintiff Penning exercised reasonable diligence under the circumstances. Plaintiffs reviewed Defendant's Cookie Banner, examined the available privacy settings, affirmatively disabled non-strictly necessary cookies and tracking technologies, and confirmed their selections. Plaintiffs thus took affirmative steps to protect their privacy and reasonably believed that Defendant would honor their selections. Plaintiffs had no reason to suspect that Defendant was secretly disregarding its express representations, and nothing alerted them to Defendant's misconduct. In particular, Plaintiffs did not observe any indication that their privacy selections were being disregarded, and Defendant's continued tracking was not apparent from their ordinary use of the Website. Plaintiffs therefore had no reason to suspect that they had suffered an injury.

18. Determining whether Defendant was, despite its promises not to, nevertheless tracking them would have required (i) Plaintiffs to suspect that Defendant was misrepresenting its practices and (ii) Plaintiffs to employ technical tools, such as browser developer tools, to inspect cookie placement and network transmissions at that time. However, Plaintiffs were (and are) unfamiliar and lacked the technical expertise to use such tools. Accordingly, Plaintiffs had neither reason to suspect that further investigation was necessary nor the technical knowledge required to independently detect Defendant's undisclosed tracking had they suspected that Defendant's cookie banner was misrepresenting the truth. Under these circumstances, Plaintiffs

could not reasonably have discovered Defendant's misconduct earlier through the exercise of reasonable diligence.

19. Plaintiffs Willis and Penning only became aware of the possibility that Defendant had lied to them and tracked their Website interaction after their Website visits. More specifically, each saw attorney advertising on the issue. Upon encountering attorney advertising concerning potential privacy violations involving Defendant's Website, they promptly responded and arranged consultations with counsel for the purpose of investigating whether Defendant had disregarded their privacy preferences. Through that process, Plaintiffs Willis and Penning learned that their privacy had been violated notwithstanding their express rejection of nonessential cookies and tracking technologies.

20. Specifically, Plaintiff Penning first learned that Defendant might have violated his privacy on or around February 11, 2026, through attorney advertising concerning Defendant's Website. He promptly responded to the advertisement and scheduled a consultation to investigate the potential violations. After obtaining additional information concerning Defendant's conduct, he immediately retained counsel to pursue his claims. On February 27, 2026, Plaintiff Shah moved for leave to amend the Complaint to add Plaintiff Penning as a plaintiff.

21. Similarly, Plaintiff Willis first learned that Defendant might have violated her privacy on or around February 11, 2026, through attorney advertising concerning Defendant's Website. She promptly responded to the advertisement and scheduled a consultation to investigate the potential violations. After obtaining additional information concerning Defendant's conduct, she immediately retained counsel to pursue her claims. On February 27, 2026, Plaintiff Shah moved for leave to amend the Complaint to add Plaintiff Willis as a plaintiff.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies.

~~18.~~22. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to

and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

~~19.~~23. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

~~20.~~24. As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

~~21.~~25. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-~~-~~ parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

~~22.~~26. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website

to identify the device making the requests, and to record a session showing how the user interacts with the website.

~~23.~~27. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

~~24.~~28. A third-party cookie is set by a third-party domain/webserver (e.g., www.google.com, demdex.net, rlcdn.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

~~25.~~29. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website ~~that~~ a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

~~26.~~30. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are

utilized to enhance website performance and generate revenue through data collection and targeted advertising.

~~27.~~31. Defendant is a global news and information company specializing in politics and policy reporting. The majority of Defendant's audience accesses its news content through its Website. Defendant owns and operates the Website, which allows visitors to read Defendant's news articles. As they interact with the Website (e.g., by entering search requests or data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California~~.~~.

~~28.~~32. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

~~29.~~33. Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

> **Cookies and Other Tracking Technologies**
>
> To help make the Sites and Applications more responsive to the needs of users, we employ a standard software feature, called a "cookie," to assign each user a unique, random number that resides on a user's computer or device. The cookie by itself does not personally identify the user; it merely identifies the computer or device with which the user accesses a Site or Application. Cookies help us track user trends and patterns.
>
> …
>
> We use third-party analytics services ("Analytics Services"), to help analyze how users use our Sites and Applications. The information generated by the cookies or

other technologies about your use of our Sites and/or Applications (the "Analytics Information") is transmitted to the Analytics Services. The Analytics Services use Analytics Information to compile reports on user activity.

…

**Tailored Advertising**

Our Site also makes use of various third-party cookie data collection and linking services. POLITICO and third-party vendors, including Google, Teads and others, may use first-party cookies (such as the Google Analytics cookies) and third-party cookies (such as the Google Ad Manager cookie) together to (i) inform, optimize, and serve ads based on your past visits to our website and (ii) report how your ad impressions, uses of ad services, and interactions with the foregoing are related to your visits to the Site. In addition, we may use Google Analytics data, including but not limited to, geographic, demographics, and interest reporting information to recognize and understand user preferences, make improvements, and for other business purposes. You can learn more about how Google manages data in its ads products, through which you can learn how to opt out of Google Analytics for display advertising or customize Google display network ads, by visiting the Google Ads Settings page. Learn more about how Teads uses data.

We also may use third-party advertising companies to target and serve some of the advertisements that appear on our Sites and Applications, and these companies likewise may use their own cookies, web beacons and similar technologies to collect information about users of our Sites and Applications. These companies may use that information, to deliver advertisements on this Site, and possibly on other websites (if the third-party advertising company operates an advertising network), tailored to match the perceived interests of consumers.

…

**Notice to California Residents**

If you are a California resident, California law requires us to provide you with some additional information regarding how we collect, use, and share your "personal information" as defined in the California Consumer Privacy Act ("CCPA").

…

**Categories of personal information we disclose for business purposes**

We may disclose the following categories of information about you or your use of the Sites and Applications for business purposes (as defined by applicable law) or as required by applicable law:

Identifiers (such as name, address, email address, IP address, device identifiers, and login information); commercial information (such as subscription and delivery history); financial data (such as credit card information); internet or other network or device activity (such as browsing history or what content you access on our Sites or Applications); geolocation information (e.g., your city and state based on IP address or precise location information from your mobile device with your consent and consistent with your mobile device settings); professional or employment related data; potentially protected classifications (such as gender, nationality, and age); physical characteristics or description (such as when you voluntarily submit

> a photo to our Site or Application); and other information that identifies or can be reasonably associated with you.
>
> The California Consumer Privacy Act (CCPA) sets forth certain obligations for businesses that "sell" personal information. Based on the definition of "sell" under the CCPA and under current regulatory guidance, we may have sold the following categories of information about you in the past twelve months: Identifiers (such as name, address, email address, IP address, or device identifiers); internet or other network or device activity; geolocation information; professional or employment related data; potentially protected classifications (such as gender, nationality, and age); physical characteristics or description (such as when you voluntarily submit a photo to our Site or Application); inferences related to the information identified.[1]

**B. <u>Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies.</u>**

~~30.~~<u>34.</u> When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." The banner then purported to provide users the opportunity to click a "Do Not Sell My Information" link, as shown in the following screenshot from the Website:




~~31.~~<u>35.</u> Plaintiffs and other Website users who clicked or selected the "Do Not Sell My Information" link were then immediately directed to a "Manage Consent Preferences" window where Defendant represented "When you visit our website, we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your

[1] Politico Privacy Policy (Last Updated: November 11, 2022) (available at https://web.archive.org/web/20230329011006/https://www.politico.com/privacy-policy) (the "Privacy Statement"). Defendant has subsequently updated its Privacy Policy but based on information and belief, this version was in effect at the time of Plaintiffs' rejection of cookies on the Website.

device, and is mostly used to make the site work as you expect it to and to provide a more personalized web experience. However, you can choose not to allow certain types of cookies. . . . Click on the different category headings to find out more and change our default settings according to your preferences. You cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the ~~proposer~~proper functioning ~~o~~of our website…" as shown in the below screenshot from the website.




~~32.~~36. Through this window, Defendant presented website users with the option to "Manage Consent Preferences" by toggling off "Performance Cookies" and "Online Behavioral Advertising" cookies, indicating the website user's choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, as shown in the below screenshot:



~~33.~~37. After Plaintiffs and other Website users rejected "Performance Cookies" and/or "Online Behavioural Advertising Cookies" in the "Manage Consent Preferences" window, Website users could then click the "Confirm My Choices" button, confirming that user's choice to not have third-party "Performance Cookies" and/or "Online Behavioural Advertising" cookies placed on that user's device. The user could then continue to browse the Website, and the popup cookie consent banner and cookie preferences window disappeared.

~~34.~~38. Defendant's popup cookie consent banner and cookie preferences window led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all non-strictly required cookies and tracking technologies, especially those "Performance Cookies" and "Online Behavioural Advertising" cookies. The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access Website users' Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking the "Do Not Sell My Information" link and rejecting all "Performance Cookies" and/or "Online Behavioural Advertising Cookies".

~~35.~~39. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other Website users' wishes. When Plaintiffs and other Website users rejected all "Performance Cookies" and "Online Behavioural Advertising Cookies" through Defendant's "Do Not Sell My Information" link, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

~~36.~~40. Nevertheless, even after receiving that notice, Defendant caused the Third-Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

~~37.~~41. In particular, when users rejected all "Performance Cookies" and "Online Behavioural Advertising Cookies" in the "Manage Consent Preferences" window accessed

through Defendant's "Do Not Sell My Information" link, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

~~38.~~42. Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to the Third Parties even after the users rejected all "Performance Cookies" and "Online Behavioural Advertising Cookies" in the "Manage Consent Preferences" window accessed through Defendant's "Do Not Sell My Information" link on the Website's popup cookie consent banner.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**




| Name | Status | Domain | Cookies |
|---|---|---|---|
| ?adExInit=aps&redir=https%3A%2F%2Fs.amazon-adsyste… | 204 | s.ad.smaato.net | 63 |
| user_sync.html?p=162412&userIdMacro=PM_UID&gdpr=0&… | 200 | ads.pubmatic.com | 36 |
| user_sync.html?kdntuid=1&p=27180&us_privacy=1YYY | 200 | ads.pubmatic.com | 35 |
| usa?loc=https%3A%2F%2Fads.servenobid.com%2Fsync%… | 302 | sync.go.sonobi.com | 35 |
| translator?source=prebid-client | 204 | hbopenbid.pubmatic.com | 34 |
| translator?source=prebid-client | 204 | hbopenbid.pubmatic.com | 34 |
| translator?source=prebid-client | 204 | hbopenbid.pubmatic.com | 34 |
| translator?source=prebid-client | 204 | hbopenbid.pubmatic.com | 34 |
| translator?source=prebid-client | 204 | hbopenbid.pubmatic.com | 34 |
| translator?source=prebid-client | 204 | hbopenbid.pubmatic.com | 34 |
| translator?source=prebid-client | 204 | hbopenbid.pubmatic.com | 34 |
| pixel?pid=273657&3pid=273657&gdpr=0&gdpr_consent=&… | 307 | ap.lijit.com | 29 |
| merge?pid=273657&3pid=273657&gdpr=0&gdpr_consent=&… | 204 | ce.lijit.com | 29 |
| cksync.php?cs=1&type=pbs&ovsid=setstatuscode&bidde…… | 302 | hbx.media.net | 28 |
| sync?pid=316&uid=F6D92618-A73F-4C93-8B47-8F1EC0A4… | 200 | ads.servenobid.com | 23 |
| sync.html?usp_consent=1YYY | 200 | public.servenobid.com | 23 |
| sync?pid=316&uid=F6D92618-A73F-4C93-8B47-8F1EC0A4… | 200 | ads.servenobid.com | 23 |
| sync?pid=317&uid=7873466745372202111&gdpr=0&gdpr_c… | 200 | ads.servenobid.com | 23 |
| sync?pid=318&uid=9Kl9lthyT-ZSjb3xjuVlYJMTPcfmVFraQ9T… | 200 | ads.servenobid.com | 23 |
| sync?pid=309&uid=u_e031f4b7-d95f-4d23-9d73-3d21960c… | 200 | ads.servenobid.com | 23 |
| sync?pid=333&uid=ZNFUSCZKxEZQ4WG6wE_bwwAACAE… | 200 | ads.servenobid.com | 23 |
| sync?pid=337&uid=y-JNlrLbJE2uEsVbG9ZBnBIMiibaweHqb… | 200 | ads.servenobid.com | 23 |
| sync?pid=327&uid=4abbd775-da40-49d2-aa6e-062a23a93… | 200 | ads.servenobid.com | 23 |
| sync?pid=332&uid=404d760c-ee35-4fec-b471-e603cd403df5 | 200 | ads.servenobid.com | 23 |
| sync?pid=324&uid=969751690663397477 | 200 | ads.servenobid.com | 23 |
| sync?pid=321&uid=RX-9b526827-b769-43fa-8d89-2bfd26e… | 200 | ads.servenobid.com | 23 |
| sync?pid=310&uid=HFJVKLZHMWdLAxcARna5vIZq | 200 | ads.servenobid.com | 23 |
| sync?pid=312&uid=3002724013052696230 | 200 | ads.servenobid.com | 23 |
| sync?pid=328&uid=3c04913d-0464-42aa-a563-652906bbddf3 | 200 | ads.servenobid.com | 23 |
| sync?pid=353&uid=3346909582498496000V10 | 200 | ads.servenobid.com | 23 |
| sync?pid=351&uid=48a258a0-2f4c-49de-9ba5-8501c5a6da… | 200 | ads.servenobid.com | 23 |
| sync?pid=339&uid=y-JNlrLbJE2uEsVbG9ZBnBIMiibaweHqb… | 200 | ads.servenobid.com | 23 |
| sync?pid=346&uid=12o238e1s0oq5q | 200 | ads.servenobid.com | 23 |
| adreq?cb=2819 | 200 | ads.servenobid.com | 23 |
| adreq?cb=4278 | 200 | ads.servenobid.com | 23 |
| adreq?cb=1457 | 200 | ads.servenobid.com | 23 |
| adreq?cb=10406 | 200 | ads.servenobid.com | 23 |
| adreq?cb=6526 | 200 | ads.servenobid.com | 23 |




| Name | Status | Domain | Cookies |
|---|---|---|---|
| adreq?cb=167 | 200 | ads.servenobid.com | 23 |
| user-registering?dataProviderId=1249&userId=AQEHJk13A6… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=977&userId=180726621092… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=1249&userId=AQEHJk13A6… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=977&userId=180726621092… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=977&userId=180726621092… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=1249&userId=AQEHJk13A6… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=737&userId=d4a64e88-beb… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=1249&userId=AQEHJk13A6… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=977&userId=180726621092… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=1025&userId=ZNFUSC…A… | 302 | ads.stickyadstv.com | 22 |
| user-registering?dataProviderId=737&userId=697618cd-4c1… | (failed) | ads.stickyadstv.com | 22 |
| 0?gdpr=0&gdpr_consent=&us_privacy=1YYY&&cb=https%3… | 302 | prebid.a-mo.net | 13 |
| user-sync?zone=181225&r=https%3A%2F%2Fads.serveno… | 200 | sync.adkernel.com | 6 |
| topics.html?pageId=108049&pid=117377&env=js-web&fv=1… | 200 | p.teads.tv | 6 |
| topics.html?pageId=119512&pid=117378&env=js-web&fv=1… | 200 | p.teads.tv | 6 |
| topics.html?pageId=108049&pid=117377&env=js-web&fv=1… | 200 | p.teads.tv | 6 |
| topics.html?pageId=119512&pid=117378&env=js-web&fv=1… | 200 | p.teads.tv | 6 |
| track?action=browser-topics&referer=https%3A%2F%2F…… | 200 | t.teads.tv | 6 |
| track?action=browser-topics&referer=https%3A%2F%2F…… | 200 | t.teads.tv | 6 |
| track?action=browser-topics&referer=https%3A%2F%2F…… | 200 | t.teads.tv | 6 |
| track?action=browser-topics&referer=https%3A%2F%2F…… | 200 | t.teads.tv | 6 |
| track?action=passback-noAd&env=js-web&auctid=6d1c3…… | 200 | t.teads.tv | 6 |
| ad?windowWidth=532&windowHeight=1034&windowDepth… | 200 | a.teads.tv | 6 |
| track?action=slotAvailable&env=js-web&auctid=6d1c3…s%… | 200 | t.teads.tv | 6 |
| track?action=placementCall&env=js-web&auctid=6d1c3…s… | 200 | t.teads.tv | 6 |
| track?action=passback-noAd&env=js-web&auctid=220c4…… | 200 | t.teads.tv | 6 |
| ad?windowWidth=532&windowHeight=1034&windowDepth… | 200 | a.teads.tv | 6 |
| track?action=slotAvailable&env=js-web&auctid=220c4…s%… | 200 | t.teads.tv | 6 |
| track?action=placementCall&env=js-web&auctid=220c4…s… | 200 | t.teads.tv | 6 |
| track?action=adCall&pid=117378&pageId=119512&aucti…s… | 200 | t.teads.tv | 6 |
| track?action=passback-noAd&env=js-web&auctid=afe17…s… | 200 | t.teads.tv | 6 |
| ad?windowWidth=801&windowHeight=1034&windowDepth… | 200 | a.teads.tv | 6 |
| track?action=slotAvailable&env=js-web&auctid=afe17…s%2… | 200 | t.teads.tv | 6 |
| track?action=placementCall&env=js-web&auctid=afe17…s… | 200 | t.teads.tv | 6 |
| tag | 200 | a.teads.tv | 6 |
| track?action=adCall&pid=117377&pageId=108049&aucti…s… | 200 | t.teads.tv | 6 |
| track?action=passback-noAd&env=js-web&auctid=ec282…… | 200 | t.teads.tv | 6 |
| ad?windowWidth=801&windowHeight=1034&windowDepth… | 200 | a.teads.tv | 6 |

mp-iowa-00110963

Elements Console Sources Network Performance Memory Application Security Lighthous

Preserve log Disable cache No throttling

Filter Invert Hide data URLs All Fetch/XHR JS CSS Img Media Font Doc WS Wasm Mar

Use large request rows

Show overview

| Name | Status | Domain | Cookies |
|---|---|---|---|
| track?action=slotAvailable&env=js-web&auctid=ec282...s%... | 200 | t.teads.tv | 6 |
| track?action=placementCall&env=js-web&auctid=ec282...s... | 200 | t.teads.tv | 6 |
| teads-format.min.js | 200 | a.teads.tv | 6 |
| tag | 200 | a.teads.tv | 6 |
| sync?callerId=9&gdpr=0&gdpr_consent=&us_privacy=1Y....... | 200 | ssbsync.smartadserver.com | 5 |
| ?partnerid=147&partneruserid=48a258a0-2f4c-49de-9ba5-8... | 200 | rtb-csync.smartadserver.com | 5 |
| ?issi=1&partnerid=76&partneruserid=GOOGLE_HOSTED_S... | 302 | rtb-csync.smartadserver.com | 5 |
| ?partnerid=76&partneruserid=&gdpr=0&gdpr_consent=&goo... | 200 | rtb-csync.smartadserver.com | 5 |
| ?issi=1&partnerid=117&partneruserid=180a1bb8ccc0dc7d4... | 200 | rtb-csync.smartadserver.com | 5 |
| async_usersync?cbfn=queuePixels | 200 | ib.adnxs.com | 5 |
| async_usersync?cbfn=queuePixels | 200 | ib.adnxs.com | 5 |
| getuid?https%3A%2F%2Fads.servenobid.com%2Fsync%3... | 302 | ib.adnxs.com | 5 |
| getuidnb?https%3A%2F%2Fpixel.rubiconproject.com%2F... | 302 | secure.adnxs.com | 5 |
| prebid | 200 | ib.adnxs.com | 5 |
| prebid | 200 | ib.adnxs.com | 5 |
| prebid | 200 | ib.adnxs.com | 5 |
| prebid | 200 | ib.adnxs.com | 5 |
| prebid | 200 | ib.adnxs.com | 5 |
| prebid | 200 | ib.adnxs.com | 5 |
| prebid | 200 | ib.adnxs.com | 5 |
| collect?v=2&fmt=js&pid=150684&time=1691893013574&u...... | 200 | px.ads.linkedin.com | 5 |
| hbjson?sp=trustx | 200 | grid.bidswitch.net | 4 |
| hbjson?sp=trustx | 200 | grid.bidswitch.net | 4 |
| hbjson?sp=trustx | 200 | grid.bidswitch.net | 4 |
| pd?us_privacy=1YYY | 200 | politico-d.openx.net | 3 |
| 13926?gdpr=0&gdpr_consent=&us_privacy=1---&r=https...... | 304 | g2.gumgum.com | 3 |
| usermatchredir?s=189872&cb=https%3A%2F%2Fusersync.... | 200 | ssum-sec.casalemedia.com | 3 |
| usermatch?us_privacy=1YYY&d=https%3A%2F%2Fwww.p... | 200 | ssum-sec.casalemedia.com | 3 |
| ibs:dpid=23728&dpuuid=ZNFUSCZKxEZQ4WG6wE-bwwAA... | 200 | dpm.demdex.net | 3 |
| current?networkId=41963&version=1 | 302 | freewheel-match.dotomi.com | 3 |
| current?networkId=41963&version=1 | 302 | freewheel-match.dotomi.com | 3 |
| current?networkId=41963&version=1 | 302 | freewheel-match.dotomi.com | 3 |
| current?networkId=41963&version=1 | 302 | freewheel-match.dotomi.com | 3 |
| cm?pub=44007&in=1 | 302 | p.rfihub.com | 3 |
| cs?pid=6&us_privacy=1YYY | 200 | ad.turn.com | 3 |
| pbjs?s=674186 | 200 | htlb.casalemedia.com | 3 |
| prebidjs | 200 | rtb.openx.net | 3 |
| 0189ecaa457f0001db681abca05405075001906d00dca?call... | 200 | visitor-service-us-west-2.tealiumiq.com | 3 |
| i.gif | 200 | collect-us-west-2.tealiumiq.com | 3 |




| Name | Status | Domain | Cookies |
|---|---|---|---|
| 0189ecaa457f0001db681abca05405075001906d00dca?call… | 200 | visitor-service-us-west-2.tealiumiq.com | 3 |
| i.gif | 200 | collect-us-west-2.tealiumiq.com | 3 |
| data | 200 | bcp.crwdcntrl.net | 3 |
| pbjs?s=674185 | 200 | htlb.casalemedia.com | 3 |
| prebidjs | 200 | rtb.openx.net | 3 |
| prebidjs | 200 | rtb.openx.net | 3 |
| pbjs?s=674205 | 200 | htlb.casalemedia.com | 3 |
| pbjs?s=674205 | 200 | htlb.casalemedia.com | 3 |
| prebidjs | 200 | rtb.openx.net | 3 |
| prebidjs | 200 | rtb.openx.net | 3 |
| pbjs?s=674205 | 200 | htlb.casalemedia.com | 3 |
| pbjs?s=674179 | 200 | htlb.casalemedia.com | 3 |
| prebidjs | 200 | rtb.openx.net | 3 |
| pbjs?s=674177 | 200 | htlb.casalemedia.com | 3 |
| prebidjs | 200 | rtb.openx.net | 3 |
| 0189ecaa457f0001db681abca05405075001906d00dca?call… | 200 | visitor-service-us-west-2.tealiumiq.com | 3 |
| data | 200 | bcp.crwdcntrl.net | 3 |
| i.gif | 200 | collect-us-west-2.tealiumiq.com | 3 |
| usermatch?s=195491&cb=https%3A%2F%2Fads.servenobi… | 200 | ssum-sec.casalemedia.com | 3 |
| ads?us_privacy=1YYY&client=ca-pub-8279698647515158… | 200 | googleads.g.doubleclick.net | 2 |
| usync.html?us_privacy=1YYY | 200 | eus.rubiconproject.com | 2 |
| aframe | 200 | www.google.com | 2 |
| imp?aid=120207&cid=3583976&imp_ck=dac25301-b523-44… | 200 | adservices.brandcdn.com | 2 |
| pr?exlist=n-smaato&fv=1.0&a=cm&cm3ppd=1&dmt=3 | 200 | s.amazon-adsystem.com | 2 |
| sync?us_privacy=1YYY& | 200 | eb2.3lift.com | 2 |
| iu3?cm3ppd=1&d=dtb-pub&csif=t&dl=n-smaato | 200 | s.amazon-adsystem.com | 2 |
| imp?aid=120207&cid=3583976&imp_ck=dac25301-b523-44… | 200 | adservices.brandcdn.com | 2 |
| anchor?ar=1&k=6LfS6L8UAAAAAAHCPhd7CF66ZbK8AyFfk… | 200 | www.google.com | 2 |
| imp_confirm.png?aid=120207&cid=3583976&buid=dac253… | 200 | adservices.brandcdn.com | 2 |
| imp_confirm.png?aid=120207&cid=3583976&buid=dac253… | 200 | adservices.brandcdn.com | 2 |
| imp_confirm.png?aid=120207&cid=3583976&buid=dac253… | 200 | adservices.brandcdn.com | 2 |
| tap.php?v=223352&nid=4584&put=9Kl9IthyT-ZSjb3xjuVIYJ… | 200 | pixel.rubiconproject.com | 2 |
| dcm?pid=78af914c-e755-4b90-bded-1b172aedc763&us_pr… | 200 | s.amazon-adsystem.com | 2 |
| sync?_origin=1&redir2=true&uid=ZNFUSCZKxEZQ4WG6wE… | 302 | ups.analytics.yahoo.com | 2 |
| tp_out?advertisable=3GMDZMBFQREVBC75SYYKWH | 200 | d.adroll.com | 2 |
| occ | 302 | ups.analytics.yahoo.com | 2 |
| img?mt_exid=74&redir=https%3A%2F%2Fsync.1rx.io%2Fu… | 302 | sync.mathtag.com | 2 |
| pbs.gif?gdpr=0&gdpr_consent=&us_privacy=1YYY&&redi…r… | 302 | sync.admanmedia.com | 2 |
| occ | 302 | ups.analytics.yahoo.com | 2 |

ıp-iowa-00110963

Elements Console Sources Network Performance Memory Application Security Lighthous

Preserve log | Disable cache | No throttling

Filter | Invert | Hide data URLs | All | Fetch/XHR | JS | CSS | Img | Media | Font | Doc | WS | Wasm | Mar

Use large request rows

Show overview

| Name | Status | Domain | Cookies |
|---|---|---|---|
| redirectuser?r=https%3A%2F%2Fads.servenobid.com%2F... | 302 | ssp.disqus.com | 2 |
| tap.php?v=186028&nid=4112&put=OPTOUT&expires=30&u... | 204 | pixel.rubiconproject.com | 2 |
| tap.php?v=4894&nid=1986&put=3002724013052696230&ex... | 204 | pixel.rubiconproject.com | 2 |
| btu4jd3a?redir=https%3A%2F%2Fpixel.rubiconproject....d... | 302 | sync-tm.everesttech.net | 2 |
| tap.php?v=191940&nid=3778&put=ZMmK4gAAA1wv8wA4&... | 204 | pixel.rubiconproject.com | 2 |
| pixelSync?nid=1&us_privacy=1YYY | 204 | pixel-sync.sitescout.com | 2 |
| sync.php?p=17404&us_privacy=1YYY | 204 | pixel.rubiconproject.com | 2 |
| 143?us_privacy=1YYY | 303 | match.deepintent.com | 2 |
| tap.php?v=1011864&nid=5528&put=di_e2875817dd8b49af8... | 200 | pixel.rubiconproject.com | 2 |
| 709414.gif?us_privacy=1YYY | 200 | id.rlcdn.com | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| pixel?d=CMu80wlQoZbpnAIYACABMAE&v=APEucNWVW3... | 200 | googleads.g.doubleclick.net | 2 |
| view?xai=AKAOjst4gWbJb4MeMzyoOoRG25kVP9Qe9SiRLz... | 200 | googleads4.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| view?xai=AKAOjsvXQ80AZ6Dm3lmzTAcEQT11te6xBLX5NTl... | 200 | securepubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| adview?ai=CtrGJSD3YZOCClbvw998PxJSP0AjdleW3XPb-j4... | 200 | securepubads.g.doubleclick.net | 2 |
| google?t=1&iid=7c2053e4-8e16-490e-8408-87172d92737...... | 200 | usw-ca2.adsrvr.org | 2 |
| adview?ai=CS4vJNz3YZKOgM-PrkPlPoM-G8AvdleW3XPb-j... | 200 | securepubads.g.doubleclick.net | 2 |
| l?ebcid=ALh7CaQ7zE935wllf-QpYwUv-9b3zAcMbsbFuLliD... | 204 | www.google.com | 2 |
| google?t=1&iid=34f704a7-11dd-4225-ad84-a0c3c51ae9f...... | 200 | vae-bid.adsrvr.org | 2 |
| getid?p=1480&g=1&j=0&asid=PE72C6984-84A4-4249-898F... | 302 | loadus.exelator.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| l?ebcid=ALh7CaQ9MZ_VAI_zqWHRAH0MLdLVizMgdNSpda... | 204 | www.google.com | 2 |
| view?xai=AKAOjsv2hJ9lWLh2P0j1KrV9XQfWEB0j_4s4Vvpsi... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=211369096250... | 200 | securepubads.g.doubleclick.net | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |

np-iowa-00110963

Elements Console Sources Network Performance Memory Application Security Lighthous

Preserve log  Disable cache  No throttling

Filter  Invert  Hide data URLs  All  Fetch/XHR  JS  CSS  Img  Media  Font  Doc  WS  Wasm  Mar

Use large request rows

Show overview

| Name | Status | Domain | Cookies |
|---|---|---|---|
| ads?pvsid=340925681482471&correlator=3945200406797... | 200 | securepubads.g.doubleclick.net | 2 |
| view?xai=AKAOjsuq6cjea0PeXnTuV3BYhi8csJoCpLy9PHQO... | 200 | securepubads.g.doubleclick.net | 2 |
| l?ebcid=ALh7CaRHn6l6gQEkUfqjY6_PS5MPyUknaYrZnmq_... | 204 | www.google.com | 2 |
| view?xai=AKAOjsu0G1WTwV_V6uyXdGHulSTKQAC628c-Tp... | 200 | securepubads.g.doubleclick.net | 2 |
| l?ebcid=ALh7CaR5JF35u0NMCnexhQQK0VxKelSMqz2R2n... | 204 | www.google.com | 2 |
| view?xai=AKAOjssotd-rXVYw_EZuY0LABO_hTUgQGGTv-6... | 200 | securepubads.g.doubleclick.net | 2 |
| l?ebcid=ALh7CaSJVsk9N5WIZhqFoP6UQHuh_Se426ePgBi... | 204 | www.google.com | 2 |
| view?xai=AKAOjsu5kLdvpKIBJ7gYOtMssfFhqHOdqU3GHDf... | 200 | securepubads.g.doubleclick.net | 2 |
| view?xai=AKAOjssdgRt2QqSbyRsKbTrDfmETelVRKlFJZ8ML... | 200 | securepubads.g.doubleclick.net | 2 |
| view?xai=AKAOjstZfRrzo7w0G2wvl29YJGSyBVr_8O0i_-Pez... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=297651004387... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=297651004387... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=297651004387... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=297651004387... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=297651004387... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=297651004387... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=297651004387... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=273703614703040&correlator=2918929385312... | 200 | securepubads.g.doubleclick.net | 2 |
| view?xai=AKAOjsvnJOjZARfQCYzmH-T7TL9sgNqi0gD-abYi... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=356439216246... | 200 | securepubads.g.doubleclick.net | 2 |
| fastlane.json?account_id=14764&site_id=374974&zone...ion... | 200 | fastlane.rubiconproject.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| ?ai=C5Y4vHT3YZlvRLYuZ998Pkc2N8A_CzJGtcKiU6szdEaiR... | 200 | googleads.g.doubleclick.net | 2 |
| ?ai=BBefVHT3YZLndLluZ998Pkc2N8A-draG4RgAAABABIP... | 200 | pubads.g.doubleclick.net | 2 |
| integrator.js?domain=www.politico.com | 200 | adservice.google.com | 2 |
| envelope?pid=0015a0000344KJJAA2&gdpr=0&src=pbjs&ve... | 200 | lexicon.33across.com | 2 |
| fastlane.json?account_id=14764&site_id=374974&zone...ion... | 200 | fastlane.rubiconproject.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| l?ebcid=ALh7CaS5hbjMn2zYEn49Q1lYhJu4ybz16iFK7nKm-... | 204 | www.google.com | 2 |
| l?ebcid=ALh7CaQSfVwyTDVJ05XQmEqgAaAbYH9NW3mNl... | 204 | www.google.com | 2 |
| l?ebcid=ALh7CaSwuP1P8tQmfy9hw7PGTSOE2y_drlspah20... | 204 | www.google.com | 2 |



p-iowa-00110963

Elements Console Sources Network Performance Memory Application Security Lighthous

Preserve log Disable cache No throttling

Filter Invert Hide data URLs All Fetch/XHR JS CSS Img Media Font Doc WS Wasm Mar

Use large request rows

Show overview

| Name | Status | Domain | Cookies |
|---|---|---|---|
| l?ebcid=ALh7CaSQFhA6DNft0E79nQ9MjwPZOGKz7MibRtJ... | 204 | www.google.com | 2 |
| fastlane.json?account_id=14764&site_id=374974&zone...3p... | 200 | fastlane.rubiconproject.com | 2 |
| fastlane.json?account_id=14764&site_id=374974&zone...3p... | 200 | fastlane.rubiconproject.com | 2 |
| fastlane.json?account_id=14764&site_id=374974&zone...3p... | 200 | fastlane.rubiconproject.com | 2 |
| fastlane.json?account_id=14764&site_id=374974&zone...ns... | 200 | fastlane.rubiconproject.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| event | 204 | prebid-a.rubiconproject.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| fastlane.json?account_id=14764&site_id=374974&zone...cti... | 200 | fastlane.rubiconproject.com | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| 14764.js?page_type=story | 200 | micro.rubiconproject.com | 2 |
| api.js?render=6LfS6L8UAAAAAAHCPhd7CF66ZbK8AyFfk3... | 200 | www.google.com | 2 |
| l?ebcid=ALh7CaTxqo6ts6YzOq8qB2LyDHVgWhYY8pQJJjG... | 204 | www.google.com | 2 |
| view?xai=AKAOjstGl2X016cYxVy7iQp_Qx9VapCQTCw-5lNJ... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=300064355368... | 200 | securepubads.g.doubleclick.net | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| l?ebcid=ALh7CaQaiuRlmaj42i3DM7TSHtbRV0NmB8lvgyL2X... | 204 | www.google.com | 2 |
| view?xai=AKAOjssVaR7wVJfkMJEeUSjHGx4tcHzX8BXCBI... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=298143987134... | 200 | securepubads.g.doubleclick.net | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| l?ebcid=ALh7CaThxYjrgqlYt1qS_APcah4vpSvl-pSyuX-M-eL... | 204 | www.google.com | 2 |
| view?xai=AKAOjstGd2nuTCHbw09cxb7E4uxxiXdkzSbVlA8i... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=446286052544... | 200 | securepubads.g.doubleclick.net | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| l?ebcid=ALh7CaSwW9SOo9WCrMQGwNGpzRZZREgtmc9c... | 204 | www.google.com | 2 |
| view?xai=AKAOjstJnedZqF73B7OvSPT_cafnMQWm8lcP-EJ... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=433102618815... | 200 | securepubads.g.doubleclick.net | 2 |
| bid?src=3875&u=https%3A%2F%2Fwww.politico.com%2F... | 200 | aax.amazon-adsystem.com | 2 |
| view?xai=AKAOjsv9R4qK4_M7w0xplQdprF9vTpRxwoj1sMy... | 200 | securepubads.g.doubleclick.net | 2 |
| ads?pvsid=2838225746416359&correlator=243644519709... | 200 | securepubads.g.doubleclick.net | 2 |
| adview?ai=CxjNMSD3YZJbfD-_D998Px7OQ-APdleW3XPb-j... | 200 | googleads.g.doubleclick.net | 2 |
| l?ebcid=ALh7CaSKlEpeXxjqUHEpv6mhZBCUeydyCyKXA3... | 204 | www.google.com | 2 |
| google?t=1&iid=7badfaae-ca18-4622-a7a8-d38ed3f48c2...1... | 200 | vae-bid.adsrvr.org | 2 |
| l?ebcid=ALh7CaT2wRCVx3iuduvAWN9wSv09pXnRX7tyk9q... | 204 | www.google.com | 2 |
| webworker.js?hl=en&v=3kTz7WGoZLQTivl-amNftGZO | 200 | www.google.com | 2 |
| ?publd=694e68b73971b58&gdpr=0&gdpr_consent=&us_pri... | 200 | onetag-sys.com | 1 |
| zrt_lookup.html | 200 | googleads.g.doubleclick.net | 1 |




| Name | Status | Domain | Cookies |
|---|---|---|---|
| sync-iframe?gdpr=0&gdpr_consent=&us_privacy=1YYY&&... | 200 | cs-server-s2s.yellowblue.io | 1 |
| ads?us_privacy=1YYY&client=ca-pub-8279698647515158... | 200 | googleads.g.doubleclick.net | 1 |
| 13685688_300x250_64ca7713a1f40.html?fas_c=https%3A... | 200 | ads.brandcdn.com | 1 |
| v1?supply_id=v5hJK9Sl&gdpr=0&gdpr_consent= | 302 | match.sharethrough.com | 1 |
| pixel?google_nid=smartrtb_dbm&google_cm&google_sc&...... | 302 | cm.g.doubleclick.net | 1 |
| bsync?uid=627080440e659fbe0f85333c665ae1de&name=S... | 307 | visitor.omnitagjs.com | 1 |
| ZNFUSCZKxEZQ4WG6wE_bwwAACAEAAAAB?gdpr_conse... | 200 | pr-bh.ybp.yahoo.com | 1 |
| ZNFUSCZKxEZQ4WG6wE_bwwAACAEAAAAB | 200 | pr-bh.ybp.yahoo.com | 1 |
| pixel?google_nid=index&google_cm&google_hm=ZNFUSCZ... | 200 | cm.g.doubleclick.net | 1 |
| i.match?p=b25&u=b3b530488fc351f7817e136a7299e17&gd... | 302 | a.tribalfusion.com | 1 |
| i.match?p=b25&u=b3b530488fc351f7817e136a7299e17&gd... | 302 | a.tribalfusion.com | 1 |
| i.match?p=b25&u=b3b530488fc351f7817e136a7299e17&gd... | 302 | a.tribalfusion.com | 1 |
| i.match?p=b25&u=b3b530488fc351f7817e136a7299e17&gd... | 302 | a.tribalfusion.com | 1 |
| RX-9b526827-b769-43fa-8d89-2bfd26e50f59-005?redir=...... | 302 | sync.targeting.unrulymedia.com | 1 |
| 022b64c9-8aed-4300-b374-cbf324d45ab3?zcc=0&sspret=1 | 302 | sync.1rx.io | 1 |
| rmpssp?sub=duration&redir=https%3A%2F%2Fads.serven... | 302 | sync.1rx.io | 1 |
| v1?supply_id=KW3eSFMR&gdpr=0&gdpr_consent=&us_priv... | 302 | match.sharethrough.com | 1 |
| rubicon?us_privacy=1YYY | 302 | sync.1rx.io | 1 |
| vast?dbm_c=AKAmf-A47culfP9PEHr7nob_Mjka6wopNNBe... | 200 | bid.g.doubleclick.net | 1 |
| ads?sz=640x480&iu=%2F6326%2FPreRollVideo_ROS%2Fp... | 200 | pubads.g.doubleclick.net | 1 |
| insync?vxii_pid=10071&vxii_pdid=aeb760a0-397e-11ee-8a7... | 200 | thrtle.com | 1 |
| ?xuid=0850b475bd5510500e8a8e580a467c9a&asid=PE72C... | 200 | nmcsync.imrworldwide.com | 1 |
| gn?prd=session&c9=devid,&c13=asid,PE72C6984-84A4-4... | 200 | secure-dcr.imrworldwide.com | 1 |
| sbofdp3qasddh7vk3oxcxmmvmpiuf1691893013.nuid.imrwo... | 200 | sbofdp3qasddh7vk3oxcxmmvmpiuf16... | 1 |
| cookie.js?domain=www.politico.com&callback=_gfp_s_...91... | 200 | partner.googleadservices.com | 1 |
| gn?prd=dcr&ci=us-607362&ch=us-607362_b01_Elections...... | 200 | secure-dcr.imrworldwide.com | 1 |
| events | 204 | bidder.criteo.com | 1 |
| auction?lib=prebid&v=7.54.0&referrer=https%3A%2F%2...ti... | 200 | tlx.3lift.com | 1 |
| cdb?ptv=136&profileId=185&av=36&wv=7.54.0&cb=870336... | 204 | bidder.criteo.com | 1 |
| cookie.js?domain=www.politico.com&callback=_gfp_s_...91... | 200 | partner.googleadservices.com | 1 |
| view?xai=AKAOjsuUtMp25j-4Lp-uRNtQr9WCGl4wg2plSSw-... | 200 | securepubads.g.doubleclick.net | 1 |
| ads?pvsid=2838225746416359&correlator=448613917084... | 200 | securepubads.g.doubleclick.net | 1 |
| events | 204 | bidder.criteo.com | 1 |
| cdb?ptv=136&profileId=185&av=36&wv=7.54.0&cb=467581... | 204 | bidder.criteo.com | 1 |
| auction?lib=prebid&v=7.54.0&referrer=https%3A%2F%2...ti... | 200 | tlx.3lift.com | 1 |
| view?xai=AKAOjssRsUZ-0xAXG1yBqYz5paNWkoKuudRhuc... | 200 | securepubads.g.doubleclick.net | 1 |
| ob_logo.svg | 200 | widgets.outbrain.com | 1 |
| achoice.svg | 200 | widgets.outbrain.com | 1 |
| ads?pvsid=2838225746416359&correlator=437403548957... | 200 | securepubads.g.doubleclick.net | 1 |




| Name | Status | Domain | Cookies |
|---|---|---|---|
| gn?prd=metadata&c9=devid,&c13=asid,PE72C6984-84A4-... | 200 | global.imrworldwide.com | 1 |
| gn?prd=dcr&ci=us-607362&ch=us-607362_b01_Elections...... | 200 | secure-dcr.imrworldwide.com | 1 |
| view?xai=AKAOjsvzQ3l6k29L9p7oukoN21lW0FxKQpN6jBD... | 200 | securepubads.g.doubleclick.net | 1 |
| view?xai=AKAOjssD58WGeD18qRy1FPYWySxWyJT84LDQl... | 200 | securepubads.g.doubleclick.net | 1 |
| view?xai=AKAOjssWAM4f2Rs0fii0EgpVDe7bj1jO0tkHjn4bk... | 200 | securepubads.g.doubleclick.net | 1 |
| events | 204 | bidder.criteo.com | 1 |
| view?xai=AKAOjsvq6p8XNaLXOoq80p8UlQnafilE86NdbhkQ... | 200 | securepubads.g.doubleclick.net | 1 |
| auction?lib=prebid&v=7.54.0&referrer=https%3A%2F%2...ti... | 200 | tlx.3lift.com | 1 |
| cdb?ptv=136&profileId=185&av=36&wv=7.54.0&cb=921490... | 204 | bidder.criteo.com | 1 |
| ads?pvsid=2838225746416359&correlator=149082538643... | 200 | securepubads.g.doubleclick.net | 1 |
| events | 204 | bidder.criteo.com | 1 |
| events | 204 | bidder.criteo.com | 1 |
| cdb?ptv=136&profileId=185&av=36&wv=7.54.0&cb=183419... | 204 | bidder.criteo.com | 1 |
| auction?lib=prebid&v=7.54.0&referrer=https%3A%2F%2...ti... | 200 | tlx.3lift.com | 1 |
| get?url=https%3A%2F%2Fwww.politico.com%2Fnews%2F... | 200 | mv.outbrain.com | 1 |
| ads?pvsid=2838225746416359&correlator=268289046053... | 200 | securepubads.g.doubleclick.net | 1 |
| cdb?ptv=136&profileId=185&av=36&wv=7.54.0&cb=135487... | 204 | bidder.criteo.com | 1 |
| auction?lib=prebid&v=7.54.0&referrer=https%3A%2F%2...ti... | 200 | tlx.3lift.com | 1 |
| events | 204 | bidder.criteo.com | 1 |
| px.gif?ch=1 | 200 | widget-pixels.outbrain.com | 1 |
| cdb?ptv=136&profileId=185&av=36&wv=7.54.0&cb=941051... | 204 | bidder.criteo.com | 1 |
| auction?lib=prebid&v=7.54.0&referrer=https%3A%2F%2...ti... | 200 | tlx.3lift.com | 1 |
| ads?pvsid=2838225746416359&correlator=297890366367... | 200 | securepubads.g.doubleclick.net | 1 |
| ads?pvsid=2838225746416359&correlator=297890366367... | 200 | securepubads.g.doubleclick.net | 1 |
| ads?pvsid=2838225746416359&correlator=297890366367... | 200 | securepubads.g.doubleclick.net | 1 |
| events | 204 | bidder.criteo.com | 1 |
| outbrain.js | 200 | widgets.outbrain.com | 1 |
| auction?lib=prebid&v=7.54.0&referrer=https%3A%2F%2...ti... | 200 | tlx.3lift.com | 1 |
| cdb?ptv=136&profileId=185&av=36&wv=7.54.0&cb=332368... | 204 | bidder.criteo.com | 1 |
| b?c1=2&c2=8298892&cs_it=b9&cv=4.0.0%2B2301240627&... | 204 | sb.scorecardresearch.com | 1 |
| execute?aid=SGPIPyCUiM | 200 | c2.piano.io | 1 |
| adsct?bci=3&eci=2&event_id=b2dae8fd-a664-4a6a-98db...... | 200 | analytics.twitter.com | 1 |
| adsct?bci=3&eci=2&event_id=b2dae8fd-a664-4a6a-98db...... | 200 | t.co | 1 |
| adsct?bci=3&eci=2&event_id=46f2920b-9d94-46d3-924b...... | 200 | analytics.twitter.com | 1 |
| adsct?bci=3&eci=2&event_id=46f2920b-9d94-46d3-924b...... | 200 | t.co | 1 |
| ?random=1691893013592&cv=11&fst=1691893013592&bg... | 200 | googleads.g.doubleclick.net | 1 |
| p?c1=2&c2=8298892&cv=2.0&cj=1 | 200 | sb.scorecardresearch.com | 1 |
| gn?prd=dcr&ci=us-607362&ch=us-607362_b01_homepage_... | 200 | secure-dcr.imrworldwide.com | 1 |
| 825814891?random=1691893013592&cv=11&fst=16918930... | 200 | td.doubleclick.net | 1 |




43. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.politico.com. The screenshots depict only network traffic occurring ***after*** the user rejected all cookies using the cookie banner.

~~39.~~44. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.google.com, demdex.net, rlcdn.com, and many others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "Do Not Sell My Information" link, and toggling off all "Performance Cookies [and] Online Behavioural Advertising" cookies in the "Manage Consent Preferences" window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

~~40.~~45. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session

information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

~~41.~~46. As users interact with the Website, even after clicking or selecting the "Do Not Sell My Information" link and toggling off "Performance Cookies [and] Online Behavioural Advertising" cookies in the "Manage Consent Preferences" window, thereby declining or rejecting the use of cookies and similar technologies for personalized content, advertising, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

~~42.~~47. The Third-Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C. The Private Communications Intercepted and Collected Through Third Party Cookies On Defendant's Website.[2]

#### 1. The Website Causes the Interception of the Contents of Communications.

~~43.~~48. The Website includes a search bar and other input fields which users enter information. For example, below are screenshots of the search bar that appears on the Website[3] where users can type into the search bar to cause the Website to search its contents.




~~44.~~49. When users input the information into the search bar, they intend to communicate the contents of their search directly to the Website.

~~45.~~50. Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected cookies in the Manage Consent Preferences window.

[3] These screenshots reflect the current formatting of the search bar on the Website. On information and belief, the Website has had the same or substantially similar search bar during the entire class period.

**2. Google Cookies.**

~~46.~~51. Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all non-strictly necessary cookies (including "Performance Cookies" and "Online Behavioural Advertising Cookies") to and from the **www.google.com**, **adservice.google.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[5] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[6]

~~47.~~52. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[7] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include

---

[4] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[5] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[6] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[7] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

~~48.~~53. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[8] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[9]

~~49.~~54. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data.[10]

---

[8] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[9] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[10] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=11962135750754589O8-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

~~50.~~55. For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's advertising domain, at https://td.doubleclick.net:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| async | 1 |
| auid | 470546358.1691892729 |
| bg | ffffff |
| cv | 11 |
| data | event=gtag.config |
| fledge | 1 |
| fmt | 3 |
| frm | 0 |
| fst | 1691893013592 |
| gtm | 45be3890 |
| guid | ON |
| hn | www.googleadservices.com |
| random | 1691893013592 |
| ref | https://www.politico.com/ |
| tiba | 'There's something missing': DeSantis can't escape Trump's shadow in Iowa - POLITICO |
| u_h | 1260 |
| u_w | 2240 |
| uaa | arm |
| uab | 64 |
| uafvl | Not%2FA)Brand;99.0.0.0\|Google%20Chrome;115.0.5790.170\|Chromium;115.0.5790.170 |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.0 |
| uaw | 0 |
| url | https://www.politico.com/news/2023/08/12/desantis-trump-iowa-00110963 |
| us_privacy | 1YYY |

~~51.~~56. The "tiba" parameter above discloses to Google the title of the page the user was viewing: "'There's something missing': DeSantis can't escape Trump's shadow in Iowa – POLITICO," where as the "url" parameter discloses the exact url the user was visiting.

~~52.~~57. The "uafvl," "uap," and "uapv" parameters disclose to Google the user's operating system and version, and browser name and version.

~~53.~~58. Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookie to be sent to Google's domain:




~~54.~~59. According to Google, the "IDE" cookie is an "advertising" cookie, used to show Google ads on non-Google sites," and "to personalize the ads you see."[11]

~~55.~~60. Finally, the data sent to Google contains the user's IP address.

~~56.~~61. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

~~57.~~62. Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[12]

---

[11] https://policies.google.com/technologies/cookies?hl=en-US. *See also* https://business.safety.google/adscookies/.

[12] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

~~58.~~63. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[13] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**3. Adobe Cookies.**

~~59.~~64. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all non-strictly necessary cookies, to and from the **demdex.net** domain (including dpm.demdex.net). These domains are associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

~~60.~~65. These cookies are used to assign a unique identifier to each site visitor, which causes Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[14] These cookies cause Adobe to obtain and store at least the

---

[13] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[14] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[15]

~~61.~~66. For example, Defendant causes the user's browser to send the following types of cookies to Adobe, at its domain dpm.demdex.net:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| demdex | 18283874595767132134100581483238882285 |
| dpm | 18283874595767132134100581483238882285 |
| dextp | 771-1-1691450835920\|<br>1123-1-1691450836825\|<br>903-1-1691450837827\|<br>1957-1-1691450838826\|<br>30432-1-1691450839826\|<br>30646-1-1691450840826\|<br>81309-1-1691450841826\|<br>60-1-1691796175725\|<br>66757-1-1691796179098\|<br>21-1-1691811286833\|<br>477-1-1691811288902\|<br>144230-1-1691811290902\|<br>144231-1-1691811291902\|<br>144232-1-1691811292902\|<br>144233-1-1691811293900\|<br>144234-1-1691811294900\|<br>144235-1-1691811295901\|<br>144236-1-1691811296901\|<br>144237-1-1691811297902 |

~~62.~~67. According to Adobe's documentation, the demdex cookie is used for tracking users for at least 180 days[16]

[15] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[16] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager.

**demdex Cookie**

| Attribute | Description |
|---|---|
| **Purpose** | Audience Manager sets this cookie to assign a unique ID to a site visitor. The demdex cookie helps Audience Manger perform basic functions, such as visitor identification, ID synchronization, segmentation, modeling, reporting, and so on. |
| **Content** | The demdex cookie contains a Unique User ID (UUID) as shown in the example below:<br>06151304227769720433039235178204449977<br>See also, Index of IDs in Audience Manager. |
| **Other Attributes** | • Lifetime: The demdex cookie has a time-to-live (TTL) interval of 180-days. The TTL is reset to 180-days upon each user interaction with a partner website. The cookie expires if a user does not come back to your site within the TTL interval.<br>• Opt-out: Audience Manager resets the cookie with a Do Not Adobe Target string if a user opts-out of data collection. In this case, the cookie TTL is set as 10 years. |

~~63.~~68. Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[17]

**4. LiveRamp Cookies.**

~~64.~~69. Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all non-strictly necessary cookies, to and from the **rlcdn.com** domain.[18] This domain is associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and

[17] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

[18] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

leverage that data for marketing and analytics purposes.[19] LiveRamp cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their user behavior.

~~65.~~70. These cookies enable LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and geolocation data (including IP addresses), on the Websites. The unique user identifier enables LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including targeted advertising and email marketing).

~~66.~~71. LiveRamp explains in its Privacy Notice the user data it receives from cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address with a cookie, LiveRamp and third parties can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context

[19] See https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[20]

**5. Additional Third Party Cookies.**

~~67.~~72. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all non-strictly necessary cookies, to and from other domains, including adnxs.com, linkedin.com, adsrvr.org, scorecardresearch.com, pubmatic.com, amazon-adsystem.com, twitter.com, t.co , yahoo.com, criteo.com, and sonobi.com.

~~68.~~73. The **adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[21] The cookies include unique identifiers that help Microsoft recognize users across different websites and sessions.[22] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location, page views, and interactions with websites.[23] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website activity occurring on any device connected to the same network using the same IP address.[24] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted

[20] *Id.*
[21] https://cookiepedia.co.uk/host/adnxs.com.
[22] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.
[23] *Id.*; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule.
[24] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

at users based on a variety of demographics, including, among other things, demography, device type, and location.[25]

~~69.~~74. The **linkedin.com** domain is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising.[26] Specifically, cookies set by the linkedIn.com domain target users with advertising and measure the performance of such ads.[27] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedIn.com cookies—download and purchase activity, and how users interact with ads.[28] Cookies set by the linkedIn.com domain are used to target users with advertisements on and off the LinkedIn social media platform.[29]

~~70.~~75. The **adsrvr.org** domain (including vae-bid.adsrvr.org) is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[30] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[31] This data helps The Trade Desk personalize ad content and track users across the internet.[32]

~~71.~~76. The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites

---

[25] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance.
[26] https://cookiepedia.co.uk/host/linkedin.com.
[27] https://www.linkedin.com/legal/cookie-policy.
[28] *Id.*
[29] *Id.*
[30] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).
[31] *Id.*
[32] *Id.*

and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[33]

~~72.~~77. The **scorecardresearch.com** domain is associated with Comscore, Inc.'s Scorecard Research service, a "leading global market research effort that studies and reports on Internet trends and behavior."[34] The ds.scorecardresearch.com domain collects a user's online identifiers, ("e.g., cookie identifiers, other hardware or device identifiers, and IP addresses"), geolocation data, browsing history, operating system, browser type, website preferences, and the duration and time of the user's website access.[35] Scorecard Research then processes "the information collected . . . to draw inferences about your predicted characteristics and preferences,"[36] which it then sells to businesses "around the world."[37] Scorecard Research then sells this collected data to website owners for a profit.

~~73.~~78. The **pubmatic.com** domain (and its subdomains, including ads.pubmatic.com; hpopenbid.pubmatic.com) is associated with PubMatic, Inc., a digital advertising company.[38] PubMatic uses pubmatic.com cookies to collect data on user behavior on websites including user interactions with advertising content.[39] PubMatic uses this data to personalize advertising content and track users across the internet.[40]

~~74.~~79. The **amazon-adsystem.com** domain is associated with Amazon's advertising services. Amazon utilizes cookies to collect data on user interactions with websites (including browsing behavior and preferences) to perform advertising and personalization functions, i.e., to assist Amazon in delivering advertisements tailored to user interests. Further, the cookies perform analytics functions to cause Amazon to measure and analyze the performance of its services and to ensure that ads are effective and relevant.

---

[33] *Id.*
[34] ScorecardResearch website (available at https://www.scorecardresearch.com/).
[35] ScorecardResearch Privacy Policy (last updated June 1, 2023) (available at https://www.scorecardresearch.com/privacy.aspx?newlanguage=1).
[36] *Id.*
[37] ScorecardResearch About page (available at https://www.scorecardresearch.com/about.aspx?newlanguage=1).
[38] *See* www.metrixlab.com.
[39] *See*, PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.
[40] *Id.*

~~75.~~80. The **twitter.com** and **t.co** domains are associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[41] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[42]

~~76.~~81. For example, the X code that the Website causes to be executed by the user's browser causes the browser to send the "personalization_id" cookie to X/Twitter:

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
| --- | --- |
| personalization_id | "v1_5K6DeC6CTo/W+dBCJalCyQ==" |

~~77.~~82. According to X/Twitter documentation, the "personalization_id" cookie "tracks activities on and off Twitter for a personalized experience."[43]

~~78.~~83. The **yahoo.com** domain is owned by Yahoo Inc., a technology company that focuses on online media and advertising. Cookies set by the yahoo.com domain are used to target website users with advertising by assigning Website users unique identifiers.[44] These cookies collect information, such as IP addresses, browser type and settings, operating system, device type, and advertising identifiers from other third parties, including Apple's ID for Advertising, Apple's ID for vendors, Google's Android ID, and Google's Play Store Ad ID.[45] Cookies are further used to support Yahoo's targeting of content and advertising and to associate users, devices, and accounts with each other or with those in a similar location, such as in the same household.[46] Yahoo's use of a unique identifier with its cookies allows it to track users across the internet and across different devices.[47] The purpose of Yahoo Inc.'s cookies and the data they

---

[41] *See* https://help.x.com/en/rules-and-policies/x-cookies.
[42] *Id.*
[43] https://help.x.com/en/rules-and-policies/x-cookies.
[44] https://cookiepedia.co.uk/host/yahoo.com
[45] https://legal.yahoo.com/us/en/yahoo/privacy/topics/cookies/index.html#:~:text=When%20you%20log%20in%20to,or%20device%20you%20are%20using.
[46] *Id.*
[47] *Id.*

collect is to track users and target them with advertisements—the sale of which Yahoo uses to generate revenues.

~~79.~~84. The **criteo.com** domain (including bidder.criteo.com) is associated with Criteo S.A., a digital advertising company that provides online advertisements.[48] Criteo S.A. uses cookies set with the criteo.com domain to build a unique profile for each website user and to target those users with advertisements.[49] Cookies set with the Criteo.com domain assign a unique identifier to users' browsers and devices, and collect data on user's pages views, behavior on websites, information on user preferences and/or interaction with advertisements, and products users have viewed, put in their digital shopping carts, and/or purchased.[50] Criteo S.A. uses this data to personalize ad content and track users across the internet to, among other things, target, price, place, and schedule advertisements.[51]

~~80.~~85. The **sonobi.com** domain is owned by Sonobi, Inc., a digital media and advertising company.[52] Sonobi, Inc. uses cookies set by the sonobi.com domain to facilitate its online advertising business. Specifically, cookies set by the sonobi.com domain share users' personal information website owners and third parties for the purpose of tailoring, analyzing, managing, reporting, optimizing and otherwise engaging in interest-based advertising.[53] Websites on which such cookies are set may allow third party advertisers to access users' devices and collect information including the type of web browser used, browser language, browser settings, browser plug-in types, other cookie and pixel tags set on the browser, type of device used to access the website, device operating system, connection type, device identifiers, IP address, Precise geographic location information, web pages or apps visited or used and the time those web pages or apps were visited or used, web page or app interaction information (such as scrolling, clicks and mouse-over), the website you visited before and after engaging with a website, the methods used to browse away from the website, users' email addresses, unique

---

[48] *See* https://www.criteo.com/platform/commerce-media-platform/.
[49] https://www.criteo.com/advertising-guidelines/.
[50] *Id.*; https://cookiepedia.co.uk/cookies/criteo.
[51] *Id.*
[52] https://sonobi.com/privacy-policy/.
[53] *Id.*

identifiers, advertisements viewed or clicked on, and information related to any connected television sets for tailored advertising purposes.[54]

~~81.~~86. The **gumgum.com** domain is owned by GumGum, Inc., a digital marketing and advertising company.[55] Cookies set by gumgum.com are used for targeted advertising.[56] Cookies set through the gumgum.com domain track users 'online behaviors from one website to another to target users' with advertising; identify whether a particular user has interacted with or view a specific ad; and transfer data to used to market the purchase and sale of online advertisements.[57] GumGum.com cookies also obtain personal information for advertising purposes, sometimes even combining personal information from cookies and other online sources to further refine advertising targeting.[58]

~~82.~~87. The **openx.net** domain is associated with OpenX Technologies, Inc., a digital advertising technology company that operates a programmatic ad exchange.[59] OpenX uses cookies to facilitate the buying and selling of digital advertising. These cookies assign unique online identifiers to users, which are used to collect data across different websites about their online activity, browsing history, and inferred interests.[60] This information enables interest-based advertising, allowing advertisers to target specific users with relevant ads. The platform also uses cookies for ad delivery management, such as controlling ad frequency, measuring campaign performance, and syncing user identifiers with other advertising partners.[61]

~~83.~~88. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

[54] *Id.*
[55] https://gumgum.com.
[56] https://cookiepedia.co.uk/host/gumgum.com.
[57] https://gumgum.com/terms-and-policies/privacy-policy.
[58] *Id.*
[59] *See* https://www.openx.com/publishers/ad-exchange/.
[60] *See* https://www.openx.com/privacy-center/ad-exchange-privacy-policy/.
[61] *See id.*

**D. The Third Parties Intercept User Communications While in Transit.**

~~84.~~89. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

~~85.~~90. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

~~86.~~91. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[62] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

~~87.~~92. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

[62] For example, Google's server-to-server API is the **Google Ads Conversion API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

~~88.~~93. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

~~89.~~94. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

~~90.~~95. On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[63] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[64] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[65] One use for Dataflow

---

[63] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

[64] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

[65] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

is the "[r]eal-time machine learning (ML) analysis of streaming data."[66] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[67]

~~91.~~96. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E. The Private Communications Collected are Valuable.**

~~92.~~97. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

~~93.~~98. The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular subscriptions, articles, or products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites

~~94.~~99. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's services and products. At scale, this data enables Defendant to assess trends across its brands and within the broader news and media

[66] *Id.*
[67] *Id.*

market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

~~95.~~100. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[68] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

~~96.~~101. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

~~97.~~102. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Vishal Shah**

~~98.~~103. Plaintiff Shah visited the Website to read the news and follow current events on multiple occasions during the last four years, including at least one in the first half of 2023.

~~99.~~104. Plaintiff Shah's visits to the Website were consistent with an ordinary Website user's visits seeking information about the news or current events. Specifically, Plaintiff

[68] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

Shah is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Politico's privacy practices.

~~100.~~105. When Plaintiff Shah visited the Website, it immediately detected that he was a visitor in California and immediately presented him with Defendant's popup cookie consent banner, which provided the option to select the "Do Not Sell My Information" link. Plaintiff Shah viewed Defendant's representation in the cookie preference window that "you can choose not to allow certain types of cookies. . . . Click on the different category headings to find out more and change our default settings according to your preferences[,]" accompanied by the toggle-sliders for the "Performance Cookies" and "Online Behavioural Advertising" cookie categories.

~~101.~~106. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Shah toggled off all "Performance Cookies" and "Online Behavioural Advertising" cookies by using Defendant's toggle-slider in the "Manage Consent Preferences" window. Plaintiff Shah then clicked Defendant's "Confirm my Choices" button. Plaintiff Shah believed that rejecting these cookies through Defendant's cookie preferences window would allow him to opt out of, decline, and/or reject all non-strictly necessary cookies and other tracking technologies (inclusive of third-party "Performance Cookies" and "Online Behavioural Advertising" cookies).

~~102.~~107. In selecting the "Do Not Sell My Information" link and toggling off "Performance Cookies [and] Online Behavioural Advertising" cookies, Plaintiff Shah gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Shah specifically rejected, based on Defendant's representations, those cookies used to "provide a more personalized web experience" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Shah continue browsing the Website.

~~103.~~108. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Shah's

device and/or transmitted to the Third Parties along with user data, without Plaintiff Shah's knowledge. Accordingly, Defendant's representations in the popup cookie consent banner and cookie preference window to Plaintiff Shah that he could reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Shah believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

~~104.~~109. Then, as Plaintiff Shah continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Shah's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Shah's Private Communications as Plaintiff Shah browsed the Website.

~~105.~~110. Defendant's representations that consumers could "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies while Plaintiff Shah and users browsed the Website, or at least those cookies involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Shah known this fact, he would not have used the Website. Moreover, Plaintiff Shah reviewed the popup cookie consent banner and cookie preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly necessary cookies, Plaintiff Shah would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

~~106.~~111. Plaintiff Shah continues to desire to browse content featured on the Website. Plaintiff Shah would like to browse websites that do not misrepresent that users can reject all non-strictly necessary cookies and tracking technologies. If the Website were

programmed to honor users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Shah would likely browse the Website again in the future, but will not do so until then. Plaintiff Shah regularly visits websites that feature content similar to that of the Website. Because Plaintiff Shah does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Shah will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Shah is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Heidi Willis**

~~107.~~112. Plaintiff Willis visited the Website on multiple occasions during the period from 2023 through 2026 for the purpose of reading news and following current events.

~~108.~~113. Plaintiff Willis' visits to the Website were consistent with an ordinary Website user's visits seeking information about the news or current events. Specifically, Plaintiff Willis is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Politico's privacy practices.

~~109.~~114. When Plaintiff Willis visited the Website, it immediately detected that she was a visitor in California and immediately presented her with Defendant's popup cookie consent banner, which provided the option to select the "Do Not Sell My Information" link. Plaintiff Willis viewed Defendant's representation in the cookie preference window that "you can choose not to allow certain types of cookies. . . . Click on the different category headings to find out more and change our default settings according to your preferences[,]" accompanied by

the toggle-sliders for the "Performance Cookies" and "Online Behavioural Advertising" cookie categories.

~~110.~~115. Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Willis toggled off all "Performance Cookies" and "Online Behavioural Advertising" cookies by using Defendant's toggle-slider. Plaintiff Willis then clicked Defendant's "Confirm my Choices" button. Plaintiff Willis believed that rejecting these cookies through Defendant's cookie preferences window would allow her to opt out of, decline, and/or reject all non-strictly necessary cookies and other tracking technologies (inclusive of third-party "Performance Cookies" and "Online Behavioural Advertising" cookies).

~~111.~~116. In selecting the "Do Not Sell My Information" link and toggling off "Performance Cookies [and] Online Behavioural Advertising" cookies, Plaintiff Willis gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Willis specifically rejected, based on Defendant's representations, those cookies used to "provide a more personalized web experience" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Willis continue browsing the Website.

~~112.~~117. After rejecting cookies, Plaintiff Willis navigated the Website by searching for news topics of interest and by accessing specific articles by clicking on links to articles on the homepage. Plaintiff Willis recalls searching for and viewing articles on at least the topic of the California senate debate in 2024.

~~113.~~118. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Willis' device and/or transmitted to the Third Parties along with user data, without Plaintiff Willis' knowledge. Accordingly, Defendant's representations in the popup cookie consent banner and cookie preference window to Plaintiff Willis that she could reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while she browsed the Website was

false. Contrary to what Defendant made Plaintiff Willis believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

~~114.~~119. Then, as Plaintiff Willis continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Willis's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Willis' Private Communications as Plaintiff Willis browsed the Website.

~~115.~~120. Defendant's representations that consumers could "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies while Plaintiff Willis and users browsed the Website, or at least those cookies involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Willis known this fact, she would not have used the Website. Moreover, Plaintiff Willis reviewed the popup cookie consent banner and cookie preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly necessary cookies, Plaintiff Willis would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

~~116.~~121. Plaintiff Willis continues to desire to browse content featured on the Website. Plaintiff Willis would like to browse websites that do not misrepresent that users can reject all non-strictly necessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Willis would likely browse the Website again in the future, but will not do so until then. Plaintiff Willis regularly visits websites that feature content similar to that of the Website. Because Plaintiff Willis does not know how the Website is programmed, which can

change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Willis will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Willis is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Stacy Penning**

~~117.~~122. Plaintiff Penning visited the Website on multiple occasions between 2023 and 2026, including on or about October 7, 2023; May 17, 2024; May 20 through May 31, 2024; and October 7, 2025, to read news content and follow current events.

~~118.~~123. Plaintiff Penning's visits to the Website were consistent with an ordinary Website user's visits seeking information about the news or current events. Specifically, Plaintiff Penning is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Politico's privacy practices.

~~119.~~124. When Plaintiff Penning visited the Website, it immediately detected that he was a visitor in California and immediately presented him with Defendant's popup cookie consent banner, which provided the option to select the "Do Not Sell My Information" link. Plaintiff Penning viewed Defendant's representation in the cookie preference window that "you can choose not to allow certain types of cookies. . . . Click on the different category headings to find out more and change our default settings according to your preferences[,]" accompanied by the toggle-sliders for the "Performance Cookies" and "Online Behavioural Advertising" cookie categories.

~~120.~~125. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Penning toggled off all

"Performance Cookies" and "Online Behavioural Advertising" cookies by using Defendant's toggle-slider. Plaintiff Penning then clicked Defendant's "Confirm my Choices" button. Plaintiff Penning believed that rejecting these cookies through Defendant's cookie preferences window would allow him to opt out of, decline, and/or reject all non-strictly necessary cookies and other tracking technologies (inclusive of third-party "Performance Cookies" and "Online Behavioural Advertising" cookies).

~~121.~~126. In selecting the "Do Not Sell My Information" link and toggling off "Performance Cookies [and] Online Behavioural Advertising" cookies, Plaintiff Penning gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Penning specifically rejected, based on Defendant's representations, those cookies used to "provide a more personalized web experience" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Penning continue browsing the Website.

~~122.~~127. After rejecting cookies, Plaintiff Penning navigated the Website by searching for news topics of interest and by accessing specific articles through the "Top News" section and the "California" and "Legal" tabs. Plaintiff Penning recalls searching for and viewing articles on at least the following topics on the Website: the massacre at the Nova Music Festival in Israel (on or around October 7, 2023); China's strategic actions in the Indo-Pacific region (on or around May 17, 2024); Donald Trump's criminal conviction in New York (on or around May 20 through May 31, 2024); and coverage relating to the Nova massacre, Shani Louk, and Israel's evolving relationship with the United States (on or around October 7, 2025).

~~123.~~128. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Penning's device and/or transmitted to the Third Parties along with user data, without Plaintiff Penning's knowledge. Accordingly, Defendant's representations in the popup cookie consent banner and cookie preference window to Plaintiff Penning that he could reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while he browsed the Website was

false. Contrary to what Defendant made Plaintiff Penning believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

~~124.~~129. Then, as Plaintiff Penning continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Penning's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Penning's Private Communications as Plaintiff Penning browsed the Website.

~~125.~~130. Defendant's representations that consumers could "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies while Plaintiff Penning and users browsed the Website, or at least those cookies involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Penning known this fact, he would not have used the Website. Moreover, Plaintiff Penning reviewed the popup cookie consent banner and cookie preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly necessary cookies, Plaintiff Penning would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

~~126.~~131. Plaintiff Penning continues to desire to browse content featured on the Website. Plaintiff Penning would like to browse websites that do not misrepresent that users can reject all non-strictly necessary cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Penning would likely browse the Website again in the future, but will not do so until then. Plaintiff Penning regularly visits websites that feature content similar to that of the Website. Because Plaintiff Penning does not know how the Website is programmed, which

can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly necessary cookies and tracking technologies, Plaintiff Penning will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Penning is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

~~127.~~132. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after rejecting "Performance Cookies" and "Online Behavioural Advertising" cookies after clicking on the "Do Not Sell My Information" link in the Website's popup cookies consent banner.

~~128.~~133. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

~~129.~~134. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

~~130.~~135. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to

be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all "Performance Cookies" and "Online Behavioural Advertising" cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

~~131.~~136. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

~~132.~~137. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected non-strictly necessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

~~133.~~138. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

~~134.~~139. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

~~135.~~140. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

~~136.~~141. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

~~137.~~142. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

~~138.~~143. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected non-strictly necessary cookies and reasonably expected that their rejection of non-strictly necessary cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

~~139.~~144. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

~~140.~~145. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. . The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed

information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

~~141.~~146. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

~~142.~~147. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

~~143.~~148. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

~~144.~~149. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

~~145.~~150. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

~~146.~~151. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and

Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

~~147.~~152. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

~~148.~~153. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

~~149.~~154. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

~~150.~~155. The Third Parties' tracking and collecting of Plaintiffs' and the Class ~~member's~~members' Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to reject and "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies.

~~151.~~156. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could reject and "opt-out of . . . Performance Cookies [and]

Online Behavioural Advertising" cookies, as well as state criminal and civil laws designed to protect individual privacy.

~~152.~~157. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could reject and "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all non-strictly necessary cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

~~153.~~158. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

~~154.~~159. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

~~155.~~160. Plaintiffs and Class members ~~seeks~~seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

161. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

~~157.~~162. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

~~158.~~163. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

~~159.~~164. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

~~160.~~165. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

~~161.~~166. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish

liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

~~162.~~167. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

~~163.~~168. Defendant is a "person" within the meaning of California Penal Code § 631.

~~164.~~169. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

~~165.~~170. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

~~166.~~171. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

~~167.~~172. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

~~168.~~173. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

~~169.~~174. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

~~170.~~175. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly ~~communicates~~communicate the Website user's affirmative decisions, actions, choices,

preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

~~171.~~176. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

~~172.~~177. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject non-strictly necessary cookies in cookie preferences window accessed through the cookie consent banner.

~~173.~~178. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

~~174.~~179. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in

their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

~~175.~~180. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

~~176.~~181. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to the news and current events. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject non-strictly necessary cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**~~Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)~~**

~~177. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.~~

~~178. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:~~

> ~~The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy~~

resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

179. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

180. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

181. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information" – including, the IP address and user-agent information – from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

182. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code – which are pen registers – to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

183. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

184. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the

~~Class members informed Defendant that they did not consent to the Website's use of third-party cookies by rejecting and "opt[ing]-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies via the "Do Not Sell My Information" link in the cookie consent banner.~~

~~185. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.~~

~~186. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.~~

~~187. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).~~

**~~Fifth~~Fourth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

~~188.~~182. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

~~189.~~183. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies.

~~190.~~184. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users rejected and "opt[ed]-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies in the cookie preferences window accessed through the "Do Not Sell My Information" link in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies.

~~191.~~185. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website

functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to reject and "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

~~192.~~186. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

~~193.~~187. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

~~194.~~188. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

~~195.~~189. Defendant's representation that consumers could "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies if they toggled off those

cookie categories in Defendant's "Manage Consent Preferences" window accessed via the "Do Not Sell My Information" link was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and the "Manage Consent Preferences" window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party non-strictly necessary cookies to be stored on Website visitors' devices that are related to personalization, advertising, analytics, and social media and/or share information with third parties even after they choose to reject all such non-strictly necessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

~~196.~~190. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject non-strictly necessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

~~197.~~191. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

~~198.~~192. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

~~199.~~193. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**~~Sixth~~Fifth Cause of Action: Unjust Enrichment**

~~200.~~194. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

~~201.~~195. Plaintiffs plead this claim in the alternative pursuant to Federal Rule of Civil Procedure 8. To the extent any purported contract between Defendant and the Class Members is found unenforceable, invalid, void, unconscionable, or inapplicable to the conduct alleged herein—including Defendant's interception and monetization of Plaintiffs' and Class Members' Private Communications after users rejected non-strictly required cookies—Plaintiffs are entitled to restitution under principles of unjust enrichment.

~~202.~~196. Plaintiffs allege that no enforceable contract governed Defendant's interception, disclosure, and monetization of Plaintiffs' and Class members' Private Communications. To the extent Defendant contends that its Privacy Policy or Website terms constituted a binding agreement, such agreement is unenforceable or inapplicable as to the conduct alleged herein because, among other reasons, Defendant failed to obtain knowing and mutual assent to the interception and disclosure of Plaintiffs' communications to Third Parties after users affirmatively rejected such tracking and Defendant materially breached any such agreement by acting contrary to its stated representations.

~~203.~~197. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements, misleading omissions, and conduct that exceeded the scope of any consent purportedly granted by Plaintiffs and Class members.

~~204.~~198. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could reject and "opt-out of . . . Performance Cookies [and] Online Behavioural Advertising" cookies, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session

information, user identifiers, and/or geolocation data, even after Class members rejected such cookies, in circumstances where no valid, enforceable agreement authorized such conduct.

~~205.~~199. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

~~206.~~200. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

~~207.~~201. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

~~208.~~202. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

~~209.~~203. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

~~210.~~204. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

~~211.~~205. Plaintiffs plead this claim separately and in the alternative to their contract-based claims. To the extent Defendant's Privacy Policy or Website terms are found unenforceable, invalid, void, unconscionable, or inapplicable to the conduct alleged herein, Plaintiffs have no adequate remedy at law and are entitled to restitution under principles of unjust enrichment.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: ~~February 27~~October 16, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Rajiv V. Thairani (State Bar No. 344390)
rajiv@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*